Charles D. Ingersoll and George Holmes, as Executors of and Trustees under the Last Will and Testament of Delia A. Blanchard, Deceased, Respondents, *v.* Robert Weld, Appellant, Impleaded with James W. Cunningham and Another, Defendants.

*Transfer of her property by a woman to her financial adviser on his agreement to pay her a certain annuity — set aside where shown to be merely colorable, although not fraudulent — relief not denied because the transfer was made to avoid the consequences of a lawsuit — the motive actuating undue influence, held to be immaterial — a refusal of the financial adviser to surrender the property makes his holding fraudulent from the beginning — loss resulting therefrom — remedy of the executors of the woman owning the property — liability of the adviser for loss pending his refusal — an accounting should be ordered.*

In an action brought by the executors and trustees under the will of Delia A. Blanchard to set aside an agreement, by the terms of which Mrs. Blanchard transferred all her property to the defendant Weld, in consideration of his promise to pay her an annual income of $20,000 during her life, it appeared that Weld was an employee of a firm of stockbrokers who, in making purchases and sales for her, had the possession and control of Mrs. Blanchard's property; that prior to the execution of the transfer Weld had managed the property of Mrs. Blanchard in such a manner as to produce in her mind great confidence in his business judgment and a sincere personal regard for him; that Weld never presented any claim to Mrs. Blanchard for compensation for such services, although it was expected that some compensation would be given; that the transfer was made upon Weld's advice in order to defeat a claim which Mrs. Blanchard apprehended (with little or no foundation for such apprehension) that the heirs of her deceased husband would make against her; that after the transfer of the property and down to the time of her death, both Mrs. Blanchard and Weld treated the transferred property as though it still belonged to Mrs. Blanchard, and as though Weld had no beneficial interest therein; that upon Mrs. Blanchard's death Weld claimed to be the owner of the property and refused to surrender it to Mrs. Blanchard's executors and heirs.

*Held,* that, while the evidence was insufficient to warrant a finding that the transfer was procured by fraud or undue influence practiced by Weld upon Mrs. Blanchard, it was sufficient to warrant the trial court in reaching the conclusion that the transfer was simply colorable and that it was the intention of the parties that Weld should become the agent and trustee of Mrs. Blanchard in the management of her property;

That relief would not be denied to the plaintiffs on the ground that their testatrix and Weld were parties *in pari delicto* in a fraudulent scheme, as the evidence warranted a finding that, by reason of the controlling influence which Weld exercised over Mrs. Blanchard's mind and actions, she was not *in pari delicto* with him when executing the transfer;

That it was immaterial whether or not Weld was actuated by an evil purpose in advising Mrs. Blanchard to make the transfer, as the test was whether his advice operated upon her mind to the extent of controlling it in making the transfer;

That the refusal of Weld, upon Mrs. Blanchard's death, to turn over the property which he held as agent and trustee for Mrs. Blanchard to her executors and heirs, operated in law to make his holding of such property fraudulent from the beginning, and entitled the executors and trustees of Mrs. Blanchard to resort to any remedy which would protect the property and secure its return, including the right to obtain an injunction *pendente lite* restraining Weld from disposing of the property;

That if any loss resulted during the operation of the injunction, because of a decline in the value of the property, such loss was a direct consequence of Weld's refusal to surrender the property to the true owners, and that Weld was liable therefor;

That the plaintiffs were entitled to an interlocutory judgment vacating and setting aside the transfer and directing an accounting;

That upon such accounting Weld should be given credit for the value of the services which he had rendered to Mrs. Blanchard prior to the transfer.

APPEAL by the defendant, Robert Weld, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of New York on the 6th day of April, 1904, upon the decision of the court rendered after a trial at the New York Special Term, with notice of an intention to bring up for review upon such appeal three intermediate orders, the first, entered in said clerk's office on the 12th day of November, 1903, appointing a receiver and granting an injunction *pendente lite*, the second, entered in said clerk's office on the 6th day of April, 1904, amending the complaint, and the third, entered in said clerk's office on the 18th day of April, 1904, refusing the said defendant's requests to find.

*John Cunneen,* for the appellant.

*Albert Stickney,* for the respondents.

HATCH, J.:

The learned counsel for the appellant has insisted with much of iteration that in the disposition of the case presented by this appeal the learned trial court omitted to examine all of the evidence in the case, and thereby fell into error in rendering the judgment from which the appeal is taken. In view of this

claim we have examined with care all of the oral testimony, together with the documentary evidence which is found in the voluminous record accompanying the appeal, in order that our determination should rest upon a fair examination and a comprehension of the entire record. Such examination leads us to the conclusion that the learned court fell into error in finding that the transfers from plaintiff's testatrix to the defendant Weld were procured by the fraud and undue influence of the defendant, operating upon the mind of the testatrix at a time when she was in ill-health and suffering from extreme nervous excitement and weakness, to such an extent that it made her wholly subject to the influence of the defendant. The fair preponderance of the evidence shows that the defendant Weld, in all of his dealings with Mrs. Blanchard, up to the date of the transfers, looked after and cared for her interests with the most scrupulous fidelity and that he handled the same with much ability and skill. Indeed it appears without dispute that during the period when he was intrusted with the management of her account he increased its value by about the sum of $93,000, for which he was never compensated a penny by Mrs. Blanchard or by any one else. In this regard the agreement between them was that he should manage her stock account while she was abroad in 1902, his compensation in that connection to be adjusted upon the basis of the profits produced. No specific sum was agreed upon, nor does it appear that any amount was ever stated or suggested by either party as the value of the services until a short time prior to the execution of the transfers, the setting aside of which is the subject of this action. That the services rendered by Weld were valuable is undisputed and his compensation therefor, in the absence of any agreement as to amount, would be measured upon the basis of a *quantum meruit.* It is quite evident that the ability and skill manifested by Weld in handling the account made a deep and lasting impression upon the mind of Mrs. Blanchard and was doubtless a controlling influence with her in the subsequent dealings and transactions had between the parties. His dealing with Mrs. Blanchard and her property from the time of her departure for Europe in 1902, down to the date of the execution of the transfer in January, 1903, were scrupulous in its fidelity to the interests of Mrs. Blanchard and he seems to have been willing that she should reap

the benefits of his manipulation without compensation. At least the question of compensation was a secondary matter with Weld, as it appears that he never presented any claim to Mrs. Blanchard or asked for a settlement, or in anywise mentioned the subject of his compensation to her prior to the transfer. The fairness and fidelity of Weld toward Mrs. Blanchard and her affairs not only produced a conviction in her mind that he · possessed ability and skill in connection with such business, but his fairness and devotion to her interests developed a sincere feeling of regard for him personally and for his wife. Her correspondence abounds in expressions of confidence in his business judgment and of affection for himself and his wife. It is also disclosed by the evidence that Mrs. Blanchard had been suffering from some physical ailment, mostly with her throat, for a considerable period of time. Her physical ailments rather increased than diminished, but it is fairly disclosed from all of the testimony that she was a woman of considerable business ability, of strong will power, was conversant with her affairs, and at all times had a full comprehension of their details and had much special knowledge concerning stocks, their value and prospects, and had been dealing in them for a number of years. The evidence shows with considerable clearness that at the time when she executed the transfers she fully understood her affairs and also understood the character of the documents which she executed and the purpose of their execution, and that she executed them freely and voluntarily. The defendant did not at that time, by any affirmative act of his, seek to influence or control her action. He passively acquiesced in what Mrs. Blanchard desired should be done. It is not needful that we recite the evidence which leads our minds to this conclusion, but we are quite convinced that the fair preponderance of all the testimony tends to establish that the transfers were executed without any attempt upon Weld's part at that time to fraudulently influence the will of Mrs. Blanchard, and that the finding · of the court to the contrary is against the clear weight of the testimony.

The court further found that the transfers, notwithstanding their form and the consideration recited therein, were not intended or understood by the parties to deprive Mrs. Blanchard of the beneficial ownership of the property which purported to be conveyed thereby, and that the defendant held the title to the property as the agent of

FIRST DEPARTMENT, APRIL, 1905.                    [Vol. 103.

and in trust for Mrs. Blanchard ; that the transfer in fact was color-
able. This is the finding of the court in substance, and it presents
the crucial question upon this appeal. It was testified by Weld
that the proposition was made by Mrs. Blanchard .to him on the
eighteenth day of January to transfer all of her property to him,
and in consideration therefor that he pay to her an annual income
of $20,000 during her life. To this proposal he at first demurred,
as well he might, for the property held by Mrs. Blanchard was
clearly insufficient to produce such an income upon any settled busi-
ness basis. As a business proposition, considering the age of Mrs.
Blanchard and her then condition of health, it was the assumption
of an obligation not justified by the value of her property, the
amount of her indebtedness and the precarious nature of some
of her stocks. Apparently without much consideration of the mag-
nitude of the burden which Weld proposed to assume, and with
little discussion of the subject, according to his testimony, he yielded
an acquiescence to Mrs. Blanchard's wish. Immediately follow-
ing this conversation, and in the same interview, Weld testifies
that Mrs. Blanchard called his attention to the fact that a claim
had been made by the heirs of her husband against his estate,
and she produced a letter suggesting a compromise of the claim.
Weld advised her to compromise and relieve herself " from worry
and strain," as it troubled her very much. Weld further testified
that she then proposed to place the property which came to her
from her husband's estate in some one's hands, so that " Clarence
Blanchard could not get any of it in case he succeeded in breaking Mr.
Blanchard's will, if he should bring suit." And Weld said : " Then
I suggested to her that she put her things in trust. As I under-
stood the words in trust, it meant that she would have the use and
could will away the principal, if she so chose, but that the income
from the property would not be over four or four and a half per
cent; no speculation could be carried ; that the money would have
to be used simply for the securities that could be bought outright
without being carried on margin." To this she replied that " she
did not want any such arrangement." Then followed a discussion
over the amount of the income which she would require, in which
he sought to have it reduced to $10,000 a year and anything over
that amount which he might make out of the property. She refused

to assent to this, and after a discussion concerning the property and its condition Weld said : " No suit is contemplated from this report so far as I can see, Mrs. Blanchard, but if you have decided that you wish to make such a paper as you say, and you think that there is any possibility that there might be any suit, I can only advise you that such a paper should be made before any suit is begun against you." She then said : " I wish your brother to draw these papers for me." It is clear, therefore, from Weld's testimony that when they were talking about the execution of the transfers to him there was embraced within it the claim which had been made against the estate by the Blanchard heirs and a suggestion that the property should be transferred in trust in order to meet any contingency which might arise respecting such claim and Mrs. Blanchard then directed the papers to be prepared. It does not appear that there was any discussion whatever with respect to a separation of the property which had come under her husband's will from her own in making the transfer, save the suggestion which Weld states she made. At the close of the interview, therefore, respecting the subject of the transfers the very last thing was the advice of Weld that they ought to be made before suit brought by the Blanchard heirs. There is no suggestion in that connection of any other motive inducing the transfers than the claim made by the Blanchard heirs, and it was to meet that condition that the direction was given at the close of the interview between Weld and Mrs. Blanchard. After the transfers had been executed the parties had considerable correspondence in relation to the property, both the stocks and real estate, and running through the whole of this correspondence is a constant statement made by Mrs. Blanchard of ownership of the property. She continually speaks of it as her own, gives directions concerning it and nothing is contained therein showing that she had surrendered the beneficial ownership of the property to Weld or that she had parted with her rights therein. Weld treated it in the same way. In a letter bearing no date, but which was evidently written on March sixth following the transaction, he again speaks about having everything turned over to him in trust and that it would put another stumbling block in the way, and after discussing the paper which would be required to be drawn, deeds, etc., with particular description, he says : " If you wish me to act as Trustee, I will certainly do so with the best

ability I can, or if you wish that I retain your affairs in my name as they now are, I will do the best I possibly can for your personal benefit & undertake the entire management the same as if it were my wife's." And in other letters he consults her about the management of her different properties. Under date of February 18, 1903, he writes : " As regards making arrangements with my brother, I have had an understanding with him that he is to attend to all papers, leases, or other legal matters that you may have or that may become necessary in the management of your affairs, or that may be necessary in relation to anything that may come up regarding such of your affairs that I may have charge of for your account. You to have full use of & to ask his opinion on any matters that you feel you would like to inquire about, & gradually as affairs are reduced in Mr. Brown's management, you can turn them over to his keeping and attention, such as insurance matters, tax affairs, &c., &c. In other words he is to act as your attorney for the year, & such papers &c., that he had already drawn are to be included in the sum I shall agree upon with him for the year. I have not yet settled it as I wish first to ask if the amount of fifty dollars a month would be considered excessive by you. In case it should become necessary that Mrs. Skinner must appear by attorney in the will matter, I have agreed with my brother that he will act as her attorney without charge (it being upon your affairs) so that it would not be necessary to have a bill run up by Ingersoll or anyone else for services rendered her on your a/c. If you consider. the amount I mention as excessive do not hesitate to so state, for in business matters I drive a bargain with my brother just the same as I would anyone else, & having charge of your affairs I shall always endeavor to treat them the same as I would want my own interests taken care of." It is clear, therefore, that the claim of Mrs. Blanchard and the written statements of Weld himself show that Weld regarded and treated the property held in his name as the property of Mrs. Blanchard. Search will be in vain to find any statement outside of his oral testimony that during her lifetime he claimed any beneficial interest in the property.

The argument presented by the learned counsel for the appellant that these letters when coupled with the oral testimony are to be regarded solely as having reference by both Mrs. Blanchard and

Weld to an interest in the income which Weld was under contract to supply is quite strained and unnatural. If his position was that of beneficial owner, why speak of it as her property and her affairs, and if he was charged with the use and management of the property solely for the purpose of producing the income, why was it necessary for her to employ and pay a lawyer to look after the drawing of her papers, the management and care of her real estate and the adjustment of insurance, taxes and other expenses? All of these matters, if the defendant Weld's contention be upheld, were charges against him, for which he was bound to provide. She had no need of an attorney upon that theory, as she had no property which required the services of an attorney in connection with its management. The employment of the attorney not only embraced all matters connected with the property subsequent to the transfers, but included the transfers as well, and for that purpose the defendant recommended the employment of his brother at a yearly stipend and Mrs. Blanchard subsequently acquiesced in such employment at the rate of $500 per year. Assuming that the argument that the parties had solely before them the question of income at the rate of $20,000 a year could be sustained, nevertheless it was quite competent for the trial court to reject such view and to conclude that neither of the parties understood at the time of the transfers that Mrs. Blanchard contemplated or intended to part with her beneficial interest in the property, or that Weld had acquired it. We have called attention to a part only of the voluminous record bearing upon this question, and in consideration of Weld's testimony coupled with the written declarations of both parties, voluminous and continuous down to the date of Mrs. Blanchard's death we have little hesitation in reaching the conclusion that the finding of the court that the transfer was colorable and that it was the intention of the parties that Weld should become the agent and trustee of Mrs. Blanchard in the management of her property is fairly supported by the evidence and clearly justified the finding.

It is claimed by the appellant, however, that if this be so, yet the transfers were the free and voluntary act of Mrs. Blanchard, clear of any fraud or undue influence upon the part of Weld, and that, therefore, the parties are *in pari delicto* in a fraudulent scheme

and the law will refuse any relief to either. Undoubtedly, if this be the fact, a court of equity will refuse its aid in setting aside the transfer. (*Robertson* v. *Sayre*, 134 N. Y. 97; *Renfrew* v. *McDonald*, 11 Hun, 254.) This rule, however, is subject to another equally well settled, which authorizes a court of equity to interpose with its aid in setting aside the instrument between persons occupying confidential relations wherein one party may naturally exercise an influence over the conduct of another. (*Boyd* v. *De La Montagnie*, 73 N. Y. 498.) We have already observed that Mrs. Blanchard had become deeply imbued with the judgment, ability and skill of Weld in the management of property such as she possessed. She relied confidently upon his judgment and implicitly in his integrity. This was the condition which had been created by the course of dealings between the parties. While she was not so ill at the time when these transfers were made as to mentally incapacitate her for understanding what she was doing, yet it is manifest that the claim which had been made by the heirs of her husband's estate had greatly disturbed and worried her, and undoubtedly created in her mind an acute apprehension not justified by the facts. It was under these circumstances that she applied to Weld for advice respecting this subject. In the course of his dealings with her he had in a perfectly legitimate manner acquired great influence over her, but, however acquired, it was an influence which operated in a marked degree upon her mind and practically controlled her action. When she asked for his advice it was as controlling in influence as though he had been actuated at that time by a fraudulent design to unduly influence her. The fact that she immediately yielded to such advice indicates the potent character of the influence operating upon her mind. It satisfactorily appears that the claim of the Blanchard heirs had little or no foundation. The first suit brought by such heirs had been dismissed and it is not made to appear that there ever existed any substantial foundation upon which to base an attack upon the Blanchard will. Under such circumstances the court was justified in finding that the parties in executing the transfers were not *in pari delicto*. In principle the case is not different from the condition which existed in *Boyd* v. *De La Montagnie* (*supra*). Therein it appeared that a wife, who sought to set aside a lease, had consented to the transaction for the

purpose of defrauding creditors at the solicitation of her husband, and it was held that the parties did not stand on equal terms and that the plea of *particeps criminis* on the part of the wife was not available under such circumstances. There the wife believed that she was liable for certain debts and sought to avoid their payment by the transfer. The fear was baseless and it was held that in the relation of husband and wife the latter did not act on equal terms. Here Mrs. Blanchard believed that the claim made against her might have substance, and did as she was advised in making the transfers by the superior influence of the defendant operating upon her mind. Under such circumstances the voluntary act of the party in making the transfer is not a defense to its being set aside, as the parties were not *in pari delicto* in such act. (*Freelove* v. *Cole*, 41 Barb. 318; affd. on appeal, 41 N. Y. 619; *Goldsmith* v. *Goldsmith*, 145 id. 313; *Watkins* v. *Jones*, 78 Hun, 496; *Bingham* v. *Sheldon*, 101 App. Div. 48.) In *Wood* v. *Rabe* (96 N. Y. 414) the court announced the principle upon which the doctrine rests in these words: " When a person through the influence of a confidential relation acquires title to property, or obtains an advantage which he cannot conscientiously retain, the court, to prevent the abuse of confidence, will grant relief." The foregoing authorities support this doctrine. It is quite evident that within this principle of law it is of little consequence whether Weld was actuated by an evil purpose in advising Mrs. Blanchard to make the transfer or not. The test is whether his advice operated upon her mind to the extent of controlling it in making the transfers and the evidence upon such point was sufficient for the court to find that it did.

The evidence leads fairly to the conclusion that during the lifetime of Mrs. Blanchard Weld acted towards her in the utmost good faith and evidently intended so to act. He was willing to execute any paper at any time restoring to Mrs. Blanchard her property. He recognized as fully and completely as written words could the relation which he occupied to her and to the property, and had he continued to occupy such position after her death there would be no basis upon which to found a judgment in fraud against him at the instance of these plaintiffs. Holding this property, as we must conclude he did, as the agent and trustee of Mrs. Blanchard and for her benefit, it follows that the beneficial title to the same vested imme-

FIRST DEPARTMENT, APRIL, 1905.　　　　　[Vol. 103.

diately in the executors to the personal property and in the heirs and devisees to the real property of Mrs. Blanchard upon her death. His refusal to surrender up. and transfer such property upon demand was an unlawful act upon his part and operated in law to make his holding and transfers by which he took title fraudulent and void as against the real owners. The position which he then assumed characterized the holding from the beginning as fraudulent and void for he has so chosen to characterize it. It was, therefore, proper to render a judgment vacating and setting aside the transfers. To permit him under these circumstances to retain the title to the property would be most unconscionable, and as the parties cannot be said to have dealt upon equal terms the right to maintain this action is apparent.

The judgment which has been rendered, however, may not be sustained in its entirety. It provides for a personal judgment against the defendant for the sum of $128,667.20, with interest, amounting in the aggregate to the sum of $131,977.16. It is also directed by the judgment that the instruments of transfer executed by Mrs. Blanchard be wholly set aside and canceled of record, and that the defendant convey and transfer to a receiver all of the property which he received thereunder. Such a judgment is not authorized. The defendant is liable for the property and for its proceeds if he has disposed of any, but the plaintiffs are not entitled to recover of him all of the property and also have a personal judgment for its value. The claim of the plaintiffs against the defendant will be entirely satisfied if all of the property of Mrs. Blanchard which the defendant has received is restored to the plaintiffs. Whatever loss has been sustained in connection with the defendant's dealings with the property, for that he is personally liable and he is also liable for any accretions thereto. This covers the time embraced within the injunction period. As the defendant was obligated to restore the property to the true owners upon the death of Mrs. Blanchard, his refusal so to do was a wrongful act upon his part, and the plaintiffs were authorized to resort to any remedy which would protect the property and secure its return. They were, therefore, authorized to apply for and obtain an injunction, *pendente lite* restraining Weld from disposing of the property and if during that period, by reason of a decline in the value of the

property, loss was entailed, such loss was a direct consequence of the act of the defendant in his refusal to surrender to the true owners the property of which he was possessed. It does not clearly appear from this record just what the amount and value of the property was which was transferred to the defendant. For that property he is bound to account. We are not able to agree with the learned court below that he was entitled to no compensation for the services which he rendered to Mrs. Blanchard prior to the transfer. On the contrary, the evidence is undisputed that the services were rendered; that it was expected some compensation would be given; that under a similar arrangement with Brown Mrs. Blanchard had paid a quarter of the profits earned. Concededly the defendant has never been paid for those services, and although his act in refusing to deliver the property upon demand was wrongful, yet such act does not deprive him of the reasonable value of his services rendered at Mrs. Blanchard's request prior to the transfer.

It necessarily follows, therefore, that the judgment should be interlocutory in form and that it should direct that an accounting be had in which the rights of the parties can be adjusted, both as to the amount and value of the property received from Mrs. Blanchard by Weld, and also the value and amount of the services which Weld rendered for her and for which he is entitled to compensation. It follows, therefore, that the judgment should be modified as indicated in this opinion, and as modified it should be affirmed, without costs to either party as against the other of this appeal.

VAN BRUNT, P. J., McLAUGHLIN and LAUGHLIN, JJ., concurred.

INGRAHAM, J. (concurring):

I concur with Mr. Justice HATCH, except in the discussion of the effect of the evidence as to the fraud of the appellant. It is quite possible, as stated by Mr. Justice HATCH, that that evidence would not justify a finding of fraud if there had been no confidential or fiduciary relations between the parties to the agreement by which the defendants acquired the legal title to substantially all of the testatrix's property. The appellant was an employee of a firm of brokers who had the possession and control of a large amount of the plaintiff's testatrix's property, and because of that position and the relations that existed between the parties to the agreement there

was reposed in the appellant the greatest trust and confidence on the part of the plaintiff's testatrix. She had intrusted to him the management and control of her property during her absence, and I think that his relations to her prior to and at the time of the execution of this contract were in their nature fiduciary, and that any agreement which he procured from her resulting in the transfer of her property to him, while those relations continued, threw upon the defendant the burden of proving that she fully understood the nature of the transaction; that no unfair advantage was taken of her in procuring the execution of a contract, and the contract, was, under the circumstances, a fair and beneficial one for her. In this, I think, the appellant fails to sustain the burden· that was upon him. It is quite plain that she never understood that the execution of this contract divested her of her property, nor did the appellant make any such claim during her life. Both parties to this agreement, as·appears from the correspondence between them, still treated the property as belonging to the plaintiff's testatrix, notwithstanding the fact that the appellant had procured from her an instrument which vested the absolute title to all her property in him, substituting for it an agreement by the appellant to pay her $20,000 a year during her life. I think the evidence clearly establishes that the plaintiff's testatrix never understood that she had made an absolute transfer of her property and that the conduct of the appellant was such as to justify her in that understanding. Under these circumstances, I think, the finding of the court that this absolute transfer of the property was obtained by fraud and undue influence of the defendants was sustained by the evidence. In fact, upon the undisputed evidence, this was the only conclusion possible, considering the relations that existed between the parties.

As to the right of this appellant to recover compensation for the services that he alleges he performed for her, I do not understand that any claim for compensation was made during her life. As before stated, he was in the employ of a firm of stockbrokers who had charge of her property and who were in the habit of making purchases and sales of stock for her account. When she was away she gave to the appellant discretion in relation to the purchase and sale of stock for her, and he apparently made a profit for her; but

I have never understood that a stockbroker, or his employees, was entitled to charge for services rendered to a customer under such circumstances more than the ordinary commission for the purchase and sale of the securities. This, as I understood this record, was all that the appellant did. As, however, the appellant will be required to account under the modification of the judgment suggested by Mr. Justice HATCH, in which I concur, the question of compensation to which the appellant is entitled for these services can more properly be determined upon that accounting.

Judgment modified as directed in opinion, and as modified affirmed, without costs.