Andrew Dressel, Plaintiff, *v.* Julius M. Hanser, Defendant.

(Supreme Court, Bronx Trial Term, November, 1917.)

Mortgages — assignment for illegal purpose — action to compel reassignment not maintainable.

> Where the assignment of a bond and mortgage was for the purpose of putting them out of the reach of the plaintiff in a negligence action brought against the assignor, and about a month thereafter the assignee, who advised the making of the assignment, by an instrument in writing declares that the bond and the mortgage belong to his assignor and that he, the assignee from whom no consideration passed for the assignment, makes no claim to the bond and mortgage, the law will leave the parties where it finds them, and an action to compel the reassignment of the bond and mortgage and an accounting for interest cannot be maintained.

Action to procure a decree requiring reassignment of a bond and mortgage and an accounting of interest received by defendant.

F. W. Hottenroth, for plaintiff.

Lazarus E. Schlector, for defendant.

Mullan, J. The plaintiff, owning a bond and mortgage securing $2,500, on April 9, 1915, assigned them to the defendant Hanser, and on May 13, 1915, the latter executed an instrument reading as follows:

" *Know all men by these presents,* that I, Julius M. Hanser, of the borough of the Bronx, city and state of New York, do hereby affirm and declare that the mortgage made by E. Marion Toussaint to Andrew Dressel, on the 19th day of November, 1914, and assigned by

him to the said Julius M. Hanser on the 9th day of April, 1915, is to belong to the said Andrew Dressel, and that the said Julius M. Hanser makes no claim to the same of any kind.

"In witness whereof I have hereunto set my hand and seal this 13th day of May, 1915.

[L. s.]   "JULIUS M. HANSER."

The defendant subsequently refused to reassign the bond and mortgage to the plaintiff, who thereupon brought this action to procure a decree requiring reassignment and an accounting of interest received by the defendant, with incidental injunctive relief. It appeared upon the trial that no consideration passed from the defendant, the plaintiff admitting that he had made the transfer in order to put the bond and mortgage out of reach of a plaintiff in an action that had been brought against him, the plaintiff here, for negligence. The plaintiff is a milk dealer, and the defendant appears to have been engaged in a small and casual way in the real estate business. The two were friends, but not intimates, the plaintiff himself denying that they were "close friends," and there is no proof, nor is there any probability from what has been proved, that there was any relationship between them of special confidence or trust. According to the plaintiff, the defendant advised the making of the assignment, and, as the defendant offered no proofs but rested on the plaintiff's case, the plaintiff's testimony in that regard is entitled to credence. That actual trust was reposed in the defendant by the plaintiff perhaps goes without saying, else the plaintiff would not have made the transfer to him. But that is the trust of mere friendship, and far from that of fiduciary relationship, as, for example, that existing in the case of *Ingersoll* v. *Weld*, 103 App. Div. 554. As was said by Talcott, J., in *Renfrew* v.

*McDonald,* 11 Hun, 254, 256: '' The case presented by the complaint is a bald case of a conveyance of the property in question, with an express intent to hinder, delay, and defraud the creditors of the plaintiff. The allegation that confidential relations existed between the parties; that the defendant was the adviser of the plaintiff in the transaction, and was sometimes a boarder at the defendant's house, are allegations of a character that might truly be made, in most cases, of such conveyances. It is not unusual, we suppose, that confidential relations, growing out, not of any legal relation or employment, but of mere personal friendship, have existed between the fraudulent grantor and his grantee.'' There is a suggestion, insinuated into the case upon the basis of testimony to which I shall later advert, that the principle of *Ingersoll* v. *Weld, supra,* or that of *Ford* v. *Harrington,* 16 N. Y. 285, might govern here; but for the sake of clarity I shall postpone detailed reference to the evidence in question until I have discussed the authorities. For the moment, therefore, I shall treat the situation we are dealing with as one unaffected by the important consideration met with in the *Ford* and *Ingersoll* cases, and the cases following them, and assume that here we have to do with the simple question whether, when parties plan and consummate a conveyance from one to the other in order to make the grantor proof against a threatened judgment, and the guilty grantee adds to his share in the initial fraud a refusal to return to its former owner the subject-matter of the conspiracy, his refusal furnishes ground for recourse against him. It is clear from the cases that the answer is not to be affected by any feeling of contempt that the conduct of such a defendant is so obviously calculated to inspire. In *Holman* v. *Johnson,* 1 Cowp. 341, Lord Mansfield said: '' ' The objection that a contract is immoral or illegal

as between plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to real justice as between him and the plaintiff; by accident, if I may so say. The principle of public policy is this: *ex dolo malo non oritur actio.* No court will lend its aid to a man upon an immoral or an illegal act. If, from the plaintiff's own stating, or otherwise the cause of action appears to arise *ex turpi causa,* or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So if the plaintiff and defendant were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it; for where both are equally at fault, *potior est conditio defendentis.' "* The law upon the subject was settled in this state in *Nellis* v. *Clark,* 20 Wend. 24; affd. by the Court of Errors in 4 Hill, 424, and approved and followed by the Court of Appeals in *Moseley* v. *Moseley,* 15 N. Y. 334. There the action was at law upon a note, and the defendant offered to prove that a certain conveyance of land to the defendant, for which the notes were given as part payment, was made in pursuance of a fraudulent scheme between the grantor and the grantee to put the property out of reach of one Otis who had, shortly prior to the conveyance, brought a slander action against the grantor. The exhaustive opinion written by the eminent judge who wrote the majority opinion, Mr. Justice Cowen, leaves little to be said upon the law of the subject as it had been expounded up to that time. He shows with

37

characteristic evidence of deep research that both at law and in equity, and as well under the principles of the common law prior to the enactment of the Statute of Frauds as thereafter, no aid in any form will be extended by the courts to a participant in a fraudulent device or conspiracy. "As," he says at page 32, " the law finds them (the defrauding grantor and grantee) so it will leave them. They derive that kind of negative assistance which arises from their cases being mutually such that the law will not tarnish its hands by rescuing them from the mire." Leonard, J., in *Sharp* v. *Wright*, 35 Barb. 236, 238, puts it thus: " It does not help the plaintiff's case that the defendants failed to observe the rule of ' honor among thieves.' The plaintiff cannot insist that he has been made a victim because the defendants disregarded that rule, and that he is exempt from the application of the legal maxim ' *potior est conditio defendentis.*' " In the same case Clerke, P. J., said: " The parties were clearly *in pari delicto.* * * * Whenever they have fraudulently or illegally contracted to do anything, it (the law) refuses to enforce the execution or to award damages for the non-execution of such contract. * * * Whatever they have executed, it refuses to lend its aid to either party to disturb." In *Daimouth* v. *Bennett,* 15 Barb. 541, which was an action to recover back money paid to compound a felony, Crippen, P. J., said (p. 545) : " In such a case the courts treat both parties as having trodden upon forbidden ground, equally in the wrong, and as being unworthy alike to ask for or receive their aid." In *Dent* v. *Ferguson,* 132 U. S. 50, Mr. Justice Lamar (at p. 66) quotes from the opinion of the district judge: " One of the objects of the bill is to prevent the defendants from reaping the lion's share of the benefits of this confessed fraud, and the maxim *in pari delicto*

*potior est conditio defendentis* has no application to a case like this," and characterizes that statement as follows: "From his view we dissent. We find no authority for the idea that it is the province of a court of equity to make a fraudulent debtor the special object of its favor because he has not received a large enough consideration for his ' confessed fraud.' That court is not a divider of the inheritance of iniquity between the respective heirs of two confederates in fraud." When *Nellis* v. *Clark* was up on appeal at the Court of Errors (4 Hill, 424), Chancellor Walworth said (p. 426): "Where both parties are equally offenders against the positive laws of the country, or the general principles of public policy, or the laws of decency or morality, *potior est conditio defendentis;* not because the defendant is more favored where both are equally criminal, but because the plaintiff is not permitted to approach the altar of justice with unclean hands. The exceptions to this rule are some few cases where the law which creates the illegality in the transaction was intended to restrain the one party and to protect the other; as in the case of extortion by public officers in receiving illegal fees, contracts by lenders of money upon which usurious interest has been paid, etc.  *  *  *  A sale or assignment for the purpose of delaying, hindering or defrauding a creditor in the collection of his debt, was illegal at the common law, and is in itself immoral and against public policy. And the statutes declaring such transactions void as against creditors, are only in affirmance of the common law on that subject.  *  *  *  It makes no difference, in the case of a suit upon an executory contract, whether the proof to establish the fraudulent or illegal nature of the transaction comes out from the examination of the plaintiff's witnesses or is introduced by the defendant, who was himself a party to the fraud." That the doc-

trine *ex turpi causa* (or *ex dolo malo,* as it is sometimes phrased) *non oritur actio* bars a decree in favor of the plaintiff here is, I think, clearly shown by the cases already cited and the following authorities: *Bolt* v. *Rogers,* 3 Paige, 154; *Davenport* v. *City Bank of Buffalo,* 9 id. 12; *Wheeler* v. *Wheeler,* 5 Lans. 355; *Sweet* v. *Tinslar,* 52 Barb. 271; *Stewart* v. *Ackley,* Id. 283; *St. John* v. *Benedict,* 6 Johns. Ch. 111; *Mapes* v. *Snyder,* 2 T. & C. 318; *Saratoga County Bank* v. *King,* 44 N. Y. 87; *Knowlton* v. *Congress & Empire Spring Co.,* 57 id. 518; *Materne* v. *Horwitz,* 101 id. 469; *Haynes* v. *Rudd,* 102 id. 372; *Robertson* v. *Sayre,* 134 id. 97; *Bartle* v. *Coleman,* 29 U. S. (4 Pet.) 184; *Wheeler* v. *Sage,* 68 U. S. (1 Wall.) 518; *Randall* v. *Howard,* 67 U. S. (2 Black) 585; *Farrar* v. *Bernheim,* 74 Fed. Repr. 436; 75 Id. 136; *Schermerhorn* v. *De Chambrun,* 64 id. 195; *Baldwin* v. *Cawthorne,* 19 Ves. 166; *Ruckman* v. *Conover,* 37 N. J. Eq. 583; *Winans* v. *Graves,* 43 id. 263; *Tyler* v. *Tyler,* 126 Ill. 525; *Powell* v. *Ivey,* 88 N. C. 256; *Walton* v. *Tusten,* 49 Misc. Rep. 569; Wait Fraud. Conv. (3d ed.) §§ 395–401; Bispham Principles of Eq. (9th ed.) § 248; Fry Spec. Perf. (4th ed.) § 480; 9 Cyc. 546; 16 id. 145; 20 id. 617. This rule of law seems to be one of universal application in courts both of law and equity throughout this country and in England, with the single exception that in Massachusetts it is otherwise in courts of law. In *Harvey* v. *Varney,* 98 Mass. 118, which was an action upon a contract made by both parties with intent to defraud, the court expressly refused to follow the decision in *Nellis* v. *Clark,* 20 Wend. *supra,* upon the ground (p. 123) that " to apply to this case the maxim, *in pari delicto potior est conditio defendentis* would be to exercise rigor beyond the limits of wholesome severity." To the same effect is the holding in *Carll* v. *Emery,* 148 Mass. 32, also at law. But even in Massachusetts the rule is

otherwise in equity. *Canton* v. *Dorchester,* 62 Mass.
(8 Cush.) 525. And see implication to that effect in the
opinion in *Harvey* v. *Varney.* In many of the cases
mentioned the acts and conduct in question were not
such as could be stigmatized as immoral, but, as in
*Saratoga County Bank* v. *King,* 44 N. Y. *supra,* they
were merely technically illegal, and there Leonard, J.,
after stating that there was no offense against the
moral law, observed (p. 94) that: " The inflexible rule
is, that no remedy can be had in a court of justice on
an illegal contract or transaction, where both parties
are *in pari delicto.*" And in equity the clean-hands
maxim would apply were there no maxim *ex turpi
causa* to make it unnecessary to resort to that salutary
doctrine that permeates all equity jurisprudence.
While no contention has been made by counsel
for the plaintiff that there is any less a *delictum*
on the part of the parties to the transaction
here called into question, for the reason that the
negligence action against the plaintiff had not
come to trial, and that, therefore, there was no
certainty at the time of the transfer that there
would be any necessity for making the transfer in order
to put the mortgage out of the reach of the plaintiff
in case he should recover judgment, such an argument
would be without force, as in many of the cases
referred to that was the precise situation of the
grantor. In some of the cases mention is made of the
fact that there was, as it later turned out, little real
occasion to fear a judgment; and there is reference in
other cases to the fact that judgment actually was
recovered later against the grantor; but clearly, I
think, although courts have seen fit to touch upon those
details in passing, it must be the presence or absence
of fraudulent *intent* that makes the transfers illegal or
legal, and not the correctness or incorrectness of the

grantor's guess upon the result of the action he finds himself called upon to defend. Nor can there be any question, upon principle, that the taint of illegality, if there be such, affects not only the original assignment here in question, but that the instrument of May 13, 1915, is likewise tainted, as it is plain that that agreement was but a part, a confirmation in writing by the defendant, of the original agreement under which the assignment of mortgage was made; but, even if it were to be considered a new and independent promise, the taint adheres. As was said in *Barton* v. *Port Jackson & U. F. F. Road Co.,* 17 Barb. 397, 408: " Where a contract grows out of, or is connected with, an illegal act, or if it is in part connected with it, it is tainted with the illegality from which it sprung, and no recovery can be had. Every new agreement entered into for the purpose of carrying into effect any of the unexecuted provisions of a previous illegal contract is void." An examination of all the cases in this state that I have been able to find in which the courts refused to apply the *in pari delicto* doctrine leads, I think, to the conclusion that the ruling, although not put in those words, was invariably based upon a finding that there was no *delictum* at all on the part of the grantor or assignor, for the reason that either actually or by force of legal presumption the mind of the grantor was overborne as to the matter in question by the grantee. In *Ford* v. *Harrington,* 16 N. Y. 285, the defrauding grantee was the grantor's lawyer, and the decision of the majority of the court, very vigorously dissented from by two of the judges, was placed expressly upon that ground. In *Freelove* v. *Cole,* 41 Barb. 318; affd., no opinion, 41 N. Y. 619, the grantee, if not admitted to practice as a lawyer (the evidence leaving that point in doubt), practiced before justices of the peace, and acted as the

grantor's lawyer and advised the making of the transfer, and the court regarded the *Ford* case as clear authority. In *Fisher* v. *Bishop,* 108 N. Y. 25, where the grantee, though apparently not admitted to practice as a lawyer, was a justice of the peace, and "largely employed by the people of the vicinity as a legal adviser and conveyancer," the court again followed the *Ford* case, and also in part based its decision upon the equity doctrine in relation to transfers without consideration between persons not dealing on equal terms, the grantor being old and feeble and having a special confidence in the defendant, who was found to have induced the transfer. In *Place* v. *Hayward,* 117 N. Y. 487, the grantee again was the grantor's lawyer, and the decision was based upon the *Ford* and *Freelove* cases; and there were also other valid grounds of distinction there from the case at bar. *Davis* v. *Graves,* 29 Barb. 480, is clearly distinguishable. There the defrauding grantee later reconveyed to the defrauding grantor, and the grantee's creditors sought to set aside the reconveyance as in fraud of them, and it was held that the moral obligation on the grantee's part to reconvey was sufficient to uphold the reconveyance. In the familiar case of *Boyd* v. *De La Montagnie,* 73 N. Y. 498, the transaction in question was a conveyance from wife to husband, and one of the findings of the trial court was that the pair intended to defraud the wife's creditors. The holding was that because of the mere relationship the wife was not on equal terms with her husband and was not therefore *in pari delicto*. Church, Ch. J., in his opinion for the court, cited *Freelove* v. *Cole*. In *Ingersoll* v. *Weld,* 103 App. Div. 554, the assignee was the trusted business agent and adviser of the female assignor, and, although it was plain that the latter was as morally guilty of fraud as the former, it was held that the case came within the doctrine of

*Boyd* v. *De La Montagnie,* and that the close confiden-
tial relationship existing between the two compelled the
conclusion that the transfers were not the free acts of
the transferor. " The test," says the court (at p. 563),
" is whether his advice operated upon her mind to the
extent of controlling it in making the transfers, and the
evidence upon such point was sufficient for the court
to find that it did." In *Watkins* v. *Jones,* 78 Hun, 496,
the grantors were an aged couple, with whom the
grantee resided, and they relied upon him as their
business adviser and friend, and the making of the
bond and mortgage in question was induced by him.
In so far as the holding was for plaintiffs, I think it
was clearly justified by the holding in *Boyd* v. *De La
Montagnie* and similar cases; but in so far as the
opinion criticises *Renfrew* v. *McDonald,* 11 Hun, 254,
and in so far as it partly bases the result upon a find-
ing that the suit against one of the mortgagors, to avoid
the possible consequences of which suit the mortgage
was made, happened to be without merit, I think the
reasoning is clearly wrong. In *Baker* v. *Gilman,* 52
Barb. 26, the plaintiff was the defendant's attorney,
and, after obtaining judgment against the defendant
for the value of legal services in defending the defend-
ant in two slander suits, brought action, as a judg-
ment creditor, to have set aside a deed made by the
defendant to one Thurston after the commencement of
the slander suits, but before their trial. The deed was
for one dollar and was admittedly made for the pur-
pose of putting the property out of the reach of the
plaintiff in the slander suits. The holding was that
the complaint in the equity action was properly dis-
missed. I think the decision was right in so far as it
was based on the finding that Baker, as Gilman's attor-
ney, knew of the deed and assented to its making, but
that it was wrong in so far as it was predicated upon the
reasoning that (p. 37) " It turned out that the several

plaintiffs in those (slander) actions had no ' lawful ' claim against Gilman.'' In *National Wall Paper Co.* v. *Hobbs,* 90 Hun, 288, the plaintiff sued to restrain the defendant from violating an agreement not to engage in business. It was held, upon the authority of a then recent case, that the contract was not in restraint of trade, and therefore that it was not illegal; but the defendant argued that the contract was the result of a corrupt conspiracy against the law and public policy of the state, and as to this Van Brunt, P. J., said for the learned General Term: '' In view of the fact that the defendant retained the price which was paid for his corrupt and wicked agreement, it is difficult to see how he can claim that he should be absolved from its obligations, or how he can claim, being a party to the instrument and having received that which he considered an adequate consideration for the restraint which was put upon his volition, that such restraint should be removed and he be permitted to enjoy the fruits of what he claims to be his unlawful agreement. We do not think that the defendant is in a position to attack this contract, certainly not with its fruits in his pocket.'' Whether the expression quoted was mere *dictum* or otherwise, I think it was an unauthorized departure from the law laid down in *Moseley* v. *Moseley,* 15 N. Y. 334, *supra,* and the other cases in the Court of Appeals hereinbefore referred to. In *Sloan* v. *Macartney,* 58 Misc. Rep. 75, the Special Term of Erie cited with approval *Renfrew* v. *McDonald,* 11 Hun, *supra,* and numerous other cases above mentioned, but it placed its refusal to allow the guilty grantee to retain the benefit of the conveyance to her upon the ground that the mind of the grantor was impaired, and that thus the transfer was not his free act. These are the only cases I have found in which the doctrine of *Nellis* v.

*Clark* may have been invoked where it was not squarely followed. Although it is beyond doubt that the courts in this state have at times hesitated to apply in its " wholesome severity " the rule laid down in *Nellis* v. *Clark,* as it was approved and formally adopted by the Court of Appeals, apparently because of an unwillingness to allow a defrauding grantee to bilk his partner in fraud, I have failed to find a case in the Court of Appeals where the rigidity of the rule was in the slightest degree relaxed. Indeed I cannot perceive how there can very well be any other rule, unless the courts are to place themselve in the position of openly countenancing and thus encouraging men to commit fraud upon their creditors. If the theory that has suggested itself to me be applied to the cases in the Court of Appeals, and generally elsewhere, I think that any doubt there might otherwise be as to whether or not the rule of *Nellis* v. *Clark* is still the law of this state must disappear, namely, that in all the cases of fraudulent transfer in which the doctrine *inter partes in pari delicto, potior est conditio defendentis* has not been applied, the refusal to do so was predicated upon the finding that there was no fraud except that of the grantee, for the reason that either in fact or by presumption the transfers were in law the acts of the grantee and not of the grantor. Upon the assumption, therefore, that the doctrine of *Nellis* v. *Clark* is still firmly imbedded in the law of this state, it remains to consider whether certain testimony which seems to have crept almost accidentally into the record brings it within the exception of the *Ford* v. *Harrington* and *Freelove* v. *Cole* cases, or within the kindred exception of the *Ingersoll* v. *Weld* class of cases. It developed that the plaintiff first met the defendant Hanser through a common friend, one Schaape, a butcher; that the plaintiff told Schaape that he, plaintiff, " had an accident;" that Hanser made his office with a lawyer

named Kaufman; that plaintiff told Hanser about the accident, and Hanser said " he (Hanser) would take care of it;" that it was Hanser who advised the assignment of the bond and mortgage; that Kaufman appeared for plaintiff in the accident case, and that Hanser never told plaintiff that Kaufman advised that the assignment be made. There was no proof, either direct or from which the inference can be drawn, that it was upon Kaufman's advice that the plaintiff made the assignment, and I can see no possible room for the application of the doctrine of the *Ford* and *Freelove* cases. Nor is the situation at all analogous to that in *Ingersoll* v. *Weld, supra.* There the defendant was the paid and trusted agent and business manager of the plaintiff, to whom the latter turned over all her very considerable property, so complete was her confidence in him, and to such an extent had he control over her affairs and her judgment. Applying the test there laid down, I deem it beyond argument that the record here is wholly lacking in proof that would support a finding that Hanser's advice " operated upon " plaintiff's " mind to the extent of controlling it in making the transfers." To hold that the plaintiff's mind was replaced or so dominated by that of Hanser would not be to draw a presumption; rather would it be to create a fiction. No amount of justified detestation of the defendant can avail the plaintiff. The law was not made to help such a creature as the defendant, but it was made to protect society, and its purpose cannot be achieved without allowing a person in the defendant's situation to retain his ill gotten gains. Nor, for that matter, need any sympathy be wasted on the plaintiff. He wanted to swindle, and was swindled. The old saying, " hoist by his own petard," comes to mind. Complaint dismissed on the merits.

Judgment accordingly.